***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission adopts with minor modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following as:
 STIPULATIONS
1. All stipulations contained in the Pre-Trial Agreement are received into evidence.
2. The parties to this action are subject to and bound by the North Carolina Workers' Compensation Act.
3. An employee-employer relationship existed between the named employee and named employer.
4. The named employer is self-insured.
5. Plaintiff's average weekly wage is $415.52.
6. An indexed set of medical records was marked as stipulated exhibit 1 and received into evidence.
 ***********
Based upon all of the competent evidence adduced from the record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 35 year old male who had been employed by defendant as a spring operator for three years. Prior to his employment with defendant and as early as March 1990, plaintiff had been diagnosed with bilateral carpal tunnel syndrome and advised to avoid spring up work.
2. No evidence was presented that plaintiff misrepresented his physical abilities with regard to the use of his hands before or after he was offered employment as a spring operator by defendant. Further, there is no evidence that plaintiff willfully intended to injure himself or to aggravate his previously diagnosed carpal tunnel syndrome. To the contrary, plaintiff maintained a continuous schedule of self-treatment in an effort to keep working despite his condition.
3. Plaintiff's spring up job was repetitive in nature and included tasks that required repetitive hand and wrist motions, and, in particular, the job involved placing seat coils in furniture as it was being made. Plaintiff would work a 40 hour workweek with some days working up to nine hours. On a typical day, he would work on nine to twelve sofas. The spring up job involved working with springs that were 12 inches long and had to be compressed to four inches by pulling on the furniture. Plaintiff had to tie eight different knots with twine on each coil.
4. During 1996, plaintiff notified Gary Pennelly, plaintiff's supervisor, that he was experiencing pain in both of his hands and needed to switch jobs. Mr. Pennelly requested that plaintiff continue to try to do spring up work. Plaintiff continued to work several more months doing spring up work after defendant was given notice that plaintiff had requested to switch jobs due to the pain he was experiencing in both of his hands. On or about 25 July 1997, plaintiff stopped working for defendant because of the pain he was experiencing in both of his hands.
5. After quitting his job, plaintiff unsuccessfully sought employment as a maintenance worker. He sought jobs through the Employment Security Commission and applied for over fifty different jobs. Beginning on 10 October 1997, plaintiff sought assistance from the North Carolina Division of Rehabilitation Services in locating employment. At that time there were no jobs available to the plaintiff that would pay plaintiff a wage similar to what he had earned in the past without retraining. Plaintiff began a two-year course of study at Catawba College. Plaintiff graduated with high honors earning an associates degree. Plaintiff then transferred to Gardner Webb College in order to earn a bachelor's degree in accounting. He had to drop out of school but he was able to secure an accounting job beginning on 23 August 2000 earning wages comparable to the wages he was earning with defendant on 25 July 1997.
6. On or about 12 January 1998, plaintiff began a course of conservative treatment with Dr. Warren B. Burrows, II, of the Carolina Hand Center at the direction of the servicing agent for defendant. Nerve conduction studies performed on 29 January 1998, revealed that plaintiff had severe carpal tunnel syndrome. Dr. Burrows recommended that plaintiff undergo bilateral carpal tunnel syndrome surgery. Plaintiff declined to undergo this surgery and on 29 January 1998 he was rated with a 5% permanent partial disability rating to each wrist and was released by Dr. Burroughs. This surgery was not reasonably necessary to lessen plaintiff's disability.
7. On 29 January 1998, plaintiff reached maximum physical improvement with regard to his bilateral carpal tunnel syndrome. Beginning on or about 1 February 1999, plaintiff began earning $30.00 a week as an events coordinator for the college he attended. Plaintiff was able to obtain this job because of his status as a student at the college.
8. While plaintiff reached maximum physical improvement with regard to his bilateral carpal tunnel syndrome on 29 January 1998, he didn't reach maximum vocational improvement, and thus maximum medical improvement, until 23 August 2000, the date that he became employed as an accountant.
9. On 22 March 2001, plaintiff was examined by Dr. E. Brown Crosby, an orthopedic hand surgeon. At that time, plaintiff occasionally needed splints on his wrists and was taking over-the-counter medications. Dr. Crosby noted that plaintiff had "notable bilateral thenar muscle atrophy" at the base of his thumbs, and was continuing to experience intermittent numbness. Dr. Crosby diagnosed plaintiff as having bilateral carpal tunnel syndrome, which was caused or significantly aggravated by his employment with defendant. He further opined that plaintiff's employment with defendant performing the spring up job placed plaintiff at an increased risk over that of the general public of contracting or aggravating the condition of carpal tunnel syndrome.
10. Dr. Crosby rated plaintiff with a 10% permanent partial disability rating to each wrist. Because Dr. Crosby's rating is the most current rating in the record, it is given greater weight than the rating provided by Dr. Burrows on 29 January 1998.
11. As a result of his employment as a spring operator for defendant, plaintiff aggravated his pre-existing bilateral carpal tunnel syndrome while employed with defendant.
12. As a result of his employment as a spring operator for defendant, plaintiff was at an increased risk of aggravating his pre-existing carpal tunnel syndrome as compared to the public not so equally exposed.
13. As a result of his employment as a spring operator for defendant, plaintiff was not able to earn any wages from 25 July 1997 to 1 February 1999.
14. As a result of his employment as a spring operator for defendant for defendant, plaintiff was only able to earn partial wages in the amount of $30.00 per week beginning on or about 1 February 1999.
15. As a result of his employment as a spring operator for defendant, plaintiff sustained a 10% permanent partial disability in both his left and right hands.
16. Defendant paid $7,884.88 in compensation payments for the time period beginning 1 August 1997 through 23 February 1998. These payments were made pursuant to a Form 63 Notice to Employee of Payment of Compensation Without Prejudice.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an occupational disease, bilateral carpal tunnel syndrome, which was due to causes and conditions characteristic of and peculiar to his employment with the defendant, which is not an ordinary disease of life to which the general public is equally exposed to outside of this employment. N.C. Gen. Stat. § 97-53(13).
2. In order to prevail on the affirmative defense of an employee's willful intent to injure himself as a bar to recovery under the Act, defendant must show that the claimant had the willful intention to injure himself and that this intention was the proximate cause of the claimant's injuries. Rorie v. Holly Farms Poultry Co., 306 N.C. 706, 295 S.E.2d 458
(1982). In this case, defendant has shown only that plaintiff continued to treat his condition himself in order that he could remain working. The evidence does not demonstrate that plaintiff had the willful intent to cause himself injury; therefore, his claim is not barred under N.C. Gen. Stat. § 97-12(3).
3. Plaintiff is entitled to receive temporary total disability compensation in the amount of $277.15 from 25 July 1997 to 1 February 2000. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to receive temporary partial disability compensation in the amount of $257.14 from 1 February 2000 to 23 August 2000. N.C. Gen. Stat. § 97-30.
5. Plaintiff is entitled to receive permanent partial disability compensation in the amount of $277.14 for 20 weeks for the permanent injury to plaintiff's right hand and $277.14 for 20 weeks for the permanent injury to plaintiff's left hand. N.C. Gen. Stat. § 97-31(12).
6. Plaintiff is entitled to have the defendant pay for medical treatment that is reasonably necessary to effect a cure, reduce pain and/or lessen plaintiff's disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay temporary total disability compensation in the amount of $277.15 per week from 25 July 1997 to 1 February 1999 and temporary partial disability compensation in the amount of $257.14 per week from 1 February 1999 to October 23, 2000. These amounts have accrued and shall be paid in a lump sum subject to the attorney's fee approved below and a credit for the $7888.88 defendant paid to plaintiff pursuant to the Form 63.
2. Defendants shall pay plaintiff permanent partial disability compensation in the amount of $277.15 for 20 weeks for the permanent injury to plaintiff's right hand and permanent partial disability compensation in the amount of $277.15 for 20 weeks for the permanent injury to plaintiff's left hand. These amounts have accrued and shall be paid in a lump sum subject to the attorney's fee approved below.
3. A reasonable attorney's fee of 25% of the total compensation awarded to plaintiff in Paragraphs 1 and 2 is approved for plaintiff's counsel and shall be paid as follows: 25% of amounts awarded shall be paid directly to the plaintiff's counsel. The 25% of the amounts awarded to plaintiff's counsel shall be deducted after the defendant has taken its credit of $7884.88.
4. Defendant shall pay expert witness fees in the amount of $325.00 to Dr. Crosby and $120.00 to Sue Brown.
5. Defendant shall pay the costs.
This the ___ day of August, 2002.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN